C. C. PIERCE ET AL. v. B. P. COBB ET AL.

(Filed 5 March, 1913.)

1. **Divorce—Notes—Contracts—Illegal Consideration—Remedies.**

Notes given by the husband in consideration of the procurement by the wife of a divorce *a vinculo* is against public policy and not enforcible, as the law will not afford a remedy to compel either of the parties to perform its obligation.

2. **Divorce—Notes—Contracts Written—Illegal Considerations—Parol Evidence.**

A note containing an indorsement that it was given in consideration of the wife of the maker obtaining a divorce *a vinculo* from him in six months, otherwise not collectible, and that payee agrees thereto, appears upon its face to arise *ex turpi causa*, and it may not be shown, in a suit by the payee thereon to purge the instrument of its illegality, that its consideration was not correctly stated in the writing, but in fact was for the payment of alimony, the parol evidence proposed being contradictory of the written instrument in that respect.

APPEAL by plaintiffs from *Bragaw, J.,* at the November Term, 1912, of PITT.

*Ward & Grimes for plaintiff.*
*Albion Dunn for defendant.*

WALKER, J. This action was brought to recover the amount of two notes under seal, dated 1 April, 1911, one for the sum of $500 due 10 June, 1911, and the other for $1,000 due 15 October, 1911, with interest after maturity. The notes were payable to

C. C. Pierce and F. C. Harding, attorneys of Mrs. Ruth Cobb, plaintiffs, and were signed by B. P. and J. H. Cobb, defendants. On the back of the notes, at the time they were executed, was the following: "It is fully understood and agreed that this note shall not become due nor collectible in any event until Mrs. Ruth Cobb shall have obtained from her husband, the said B. P. Cobb, in a court of competent jurisdiction, a complete and absolute divorce from the bonds of matrimony, and shall present the said B. P. Cobb a duly certified copy of the decree granting same; this being the consideration for which this note is given. If the said Ruth Cobb shall fail to secure said divorce within at least six months from 10 June, 1911, then this note shall be null and void. And the payees herein, in accepting this note, agree to the conditions above set out." Plaintiffs offered to show by the testimony of C. C. Pierce, one of the plaintiffs, that the writing on the back of the notes did not truly express the agreement, and that the real agreement was really one to pay alimony; he admitted, though, that he knew of the indorsement when he received the notes for Mrs. Ruth Cobb, and that it provided that the consideration of the notes was the divorce of the defendant, B. F. Cobb, from the bonds of matrimony, and while he protested against the insertion of the clause, he did not require that it should be stricken out, but received the notes and has brought this action upon them with the indorsement still there, and also that the understanding was that the notes should not be paid until the divorce was granted. The testimony of C. C. Pierce was tendered in these words: "Plaintiffs offer to prove a contradiction of the stipulation on the back of the notes, and that such proof will show a lawful consideration for the payment of support and alimony." At the close of the plaintiff's evidence, the court ordered a nonsuit, and plaintiffs appealed.

The objection was made that plaintiffs cannot maintain this action, because they are not the real parties in interest (Revisal, sec. 400), nor are they, within the meaning of the Revisal, sec. 404, "trustees of an express trust," and *Martin v. Mask,* 158 N. C., 436, was cited in support of the contention; but we need not decide that question, as we are satisfied that upon another

ground the notes are void, and the nonsuit was properly entered.. No contract which is against good morals or the public policy of the State will be enforced by its courts. If the consideration upon which it is based is illegal, the courts will leave the parties where it found them, and will lend their aid to neither of the parties. The law will give no sanction to a transaction which involves the violation of its principles, nor will it afford a remedy to compel either of the parties to perform its obligation. It was said in *Edwards v. Goldsboro,* 141 N. C., at p. 72: "The law gives no action to a party upon an illegal contract, either to enforce it directly or to recover back money paid on it after it has been executed. *Webb v. Fulchire,* 25 N. C., 485; *Warden v. Plummer,* 49 N. C., 524; 15 Am. and Eng. Enc. (2 Ed.), 997. The rule rests upon the broad ground that no court will allow itself to be used when its judgment will consummate an act forbidden by law. The maxim is *ex dolo malo* (or *ex turpi causa*) *non oritur actio,* and the kindred one is *in pari delicto potior est conditio defendentis.* In such cases the law leaves the parties where it finds them. When parties are *in pari delicto* in respect to an illegal contract, and one obtains advantage over the other, a court will not grant relief (*Wright v. Cain,* 93 N. C., 296), and when they have united in an unlawful transaction to injure another or others or the public, or to defeat the due administration of the law, or when the contract is against public policy, or *contra bonos mores,* the courts will not enforce it in favor of either party. *York v. Merritt,* 77 N. C., 213; *ibid.,* 80 N. C., 285; *King v. Winants,* 71 N. C., 469; *Pinckston v. Brown,* 56 N. C., 494; *Sparks v. Sparks,* 94 N. C., 532." If the object of a contract is to divorce man and wife, the agreement is against public policy and void. The reason of this rule is that the law views with repugnance all contracts, the purpose or direct tendency of which, as gathered from its terms, is to dissolve the marriage tie, because of its regard for virtue, the good order of society, the welfare of the children as the fruit of the union, and the peculiar sanctity of the marital relation. The husband and wife cannot do by their consent what the law forbids to be

done except by the legislative will, and then only in the way and by the method authorized. "The inducement of a wife to sue for a divorce by a promise on the part of the husband to remunerate her for it, or for a husband and wife to agree that one of them shall bring a suit for a divorce and the other shall not defend, is against the law, which recognizes and upholds the sanctity of marriage, and is void. The same is true of an agreement, after a divorce has been granted, that the husband will pay the wife money if she will not move for a new trial, or, where the divorce has been wrongfully granted, that the parties will not disturb it. And an agreement not to sue or make claim for alimony has been held void. A promise to marry made by a man already married, to take effect when he has obtained a divorce from his present wife, is illegal and void." 9 Cyc., 519-520. All this will be found fully discussed in the books, and especially in the one just cited. It is such familiar learning that we need not make further comment upon it. *Archbell v. Archbell,* 158 N. C., 408.

The remaining question is, whether this contract is within the principle and the denunciation of the law. We think it will so appear by an examination of the indorsement on the notes. It stipulates that Mrs. Ruth Cobb shall obtain a divorce in the courts and that the notes are not to be payable until she has done so, and she is allowed only six months within which to secure the divorce. In other words, she must obtain a divorce as a condition of her right to have the money upon the notes, and she must do it quickly, or at least without any delay, the penalty of which is the forfeiture of the money. She could not, under our procedure, obtain the divorce in shorter time than that fixed by the instrument. There is a clear and irresistible implication to be drawn from the terms of the written condition, that B. P. Cobb, the husband, will not resist or retard her recovery, but she was to have her own way. If we could consider the testimony of Mr. Pierce, it would appear that the object of this transaction, as we have stated it, was well understood by the parties, and so well was its legal effect appreciated that he protested against it, but did not have the

illegal stipulation eliminated. It would also appear that the husband was engaged in assisting his wife to procure evidence, the testimony of a lewd woman, to convict him of infidelity, so that a divorce *a vinculo* might be had, and a deposition for this purpose was actually taken and the name of another witness of unsavory reputation was furnished. But it is not necessary that the oral testimony should be further dwelt upon, as the instrument, we think, is void on its face, without any aid from extrinsic facts, and, besides, the offer to contradict or vary its terms was properly excluded from consideration in granting the nonsuit. This was not a proposal to show a parol agreement contemporaneous with and collateral to the written agreement, and also consistent with it, so that the two could well stand together in perfect harmony, but it was an attempt to overthrow the written contract and to substitute a new one in its place, the terms of which are not only repugnant to it, but utterly destructive of it. · The rule is established that the collateral oral agreement must not contradict that which is written; but leaving it in full force, as expressed by the parties in the writing, the other part of the contract is permitted to be shown in order to round it out, so that it will appear in its completeness, the same as if all of it had originally been reduced to writing. *Evans v. Freeman,* 142 N. C., 61. In Clark on Contracts (2 Ed.), p. 85, the rule is thus expressed: "Where a contract does not fall within the statute, the parties may at their option put their agreement in writing or may contract orally, or put some of the terms in writing and arrange others orally. In the latter case, although that which is written cannot be varied by parol evidence, yet the terms arranged orally may be proved by parol, in which case they supplement the writing, and the whole constitute one entire contract." The foregoing principles are fully discussed in *Cobb v. Clegg,* 137 N. C., 153; *Typewriter Co. v. Hardware Co.,* 143 N. C., 97; *Evans v. Freeman, supra; Woodson v. Beck,* 151 N. C., 144; *Walker v. Cooper,* 150 N. C., 129; *Basnight v. Jobbing Co.,* 148 N. C., 350; *Walker v. Venters,* 148 N. C., 388; *Medicine Co. v. Mizell,* 148 N. C., 384; some of the earlier cases being

*Twidy v. Sanderson,* 31 N. C., 5; *Kerchner v. McRae,* 80 N. C., 219; *Braswell v. Pope,* 82 N. C., 57, and *Terry v. R. R.,* 91 N. C., 236, citing *Hawkins v. Lea,* 8 Lea (Tenn.), 42. In *Cobb v. Clegg, supra,* after stating the general rule that "when parties reduce their agreement to writing, it is a rule of evidence that parol testimony is not admissible to contradict, add to, or vary it, for although there may be no law requiring the particular agreement to be in writing, yet the written memorial is regarded as the surest evidence," the Court further said that this rule did not apply where the writing is not, and was not understood to be, a memorial of the whole agreement, which is severable into parts, one of the parts only having been reduced to writing, for in such a case it is competent to show, by oral proof, the other part, if not in conflict with that which had been written, the oral part being but the complement or counterpart of the other. Even when the rule is properly understood, there will sometimes be difficulty in its application, as shown in the cases upon the subject, but we are quite sure that the evidence offered in this case falls within the rule of exclusion, as it plainly not only contradicts the written terms, but completely subverts them, or at least displaces them for another contract with different, if not opposite, stipulations. In *Moffitt v. Maness,* 102 N. C., 457, we are admonished that the salutary rule against the admissibility of parol testimony to vary the terms of a written instrument has, perhaps, been relaxed too much, the farthest limit having been reached, beyond which it is not safe to go. The Court sounds the alarm and warns us against the dangers ahead, which warning we should carefully heed, as we said in *Cobb v. Clegg, supra.* It is best to trust to the words of the writing, which the parties have chosen to protect and preserve the integrity of their treaty, than to rely on human memory for the exact reproduction of their words, for *Judge Taylor* said in *Smith v. Williams,* 5 N. C., 426: "The writers on the law of evidence have accordingly, in arranging the degrees of proof, placed written evidence of every kind higher in the scale of probability than unwritten; and notwithstanding the splendid eloquence of Cicero to the con-

trary, in his declaration for the poet Archias, the sages of our law have said that the fallibility of human memory weakens the effect of that testimony which the most upright mind, awfully impressed with the solemnity of an oath, may be disposed to give. Time wears away the distinct image and clear impression of the fact and leaves in the mind uncertain opinions, imperfect notions, and vague surmises." We must adhere strictly to the rule, which is of very ancient origin and has been accepted and highly regarded from the earliest to the latest periods of the law, as affording the safest ground for courts and juries to ascertain and settle contested rights, by requiring that formal writings, which bespeak solemnity and deliberation in their preparation and execution, "shall be standing evidence against the parties entering into them," as it was put by *Justice Ashurst* in 4 Term, 331. The solemn wills, deeds, and other writings by which we settle our estates and rights was once said to be the laws which private men are allowed to make for themselves and not to be altered, even by the King in his courts of law, and not in the court of conscience, except for fraud or mistake. *Lord Dyer,* in Plowden, 345. In two more recent cases the rule is considered with special reference to facts much like those now before us. *Sir William Grant* said, in 7 Vesey, 211: "By the rule of law, independent of the statute, parol evidence cannot be received to contradict a written agreement. To admit it for the purpose of proving that the written instrument does not contain the real agreement would be the same as receiving it for every purpose. It was for the purpose of shutting out that inquiry that the rule was adopted. Though the written instrument does not contain the terms, it must in contemplation of law be taken to contain the agreement, as furnishing better evidence than any parol can supply"; and *Judge Chase* said in *O'Harra v. Hall,* 4 Dallas (U. S.), 340 (1 L. Ed., 858): "You may explain, but you cannot alter, a written contract by parol testimony. A case of explanation implies uncertainty, ambiguity, and doubt upon the face of the instrument. But the proposition now is a plain case of alteration, that is, an offer to prove by witnesses that the assignor promised something beyond the plain words and meaning of his

written contract. Such evidence is inadmissible, and has been so adjudged in the Supreme Court, in *Clark v. Russell,* 3 Dal., 415. I grant that chancery will not confine itself to the strict rule, in cases of fraud and of trust; but we are sitting as judges at common law, and I can perceive no reason to depart from it."

The proposal here is to show a different contract, for the purpose, it is said, of purging the one which is evidenced solely by the writing of its illegal taint; but this will not do, as it plainly contravenes the rule of exclusion. If there was any mistake in expressing the true agreement, the party must resort to a different method for its correction, by which, perhaps, relief might be had, if the case appealed to the conscience of the court, which is, at least, doubtful. Defendant denies that the parties have failed to embody their agreement in the writing and relies upon the rule. The offer to change the aspect of the contract by oral proof has somewhat the appearance of an afterthought by the wife. The transaction has passed beyond the stage where any *locus penetentiæ* can be found to avail anything in her extremity. It is not what the man and his wife may now think would have been a better instrument for them, or a more ingenious, though less ingenuous, form of expression, in view of the attack now made upon the notes in suit, and certainly not what one of them may so think, but what they really have done, as shown by their written and not their spoken words. They entered into a contract forbidden by the law, and we can give no aid to its enforcement, but must affirm the judgment of nonsuit.

Affirmed.